UNITED STATES OF AMERICA,

  Plaintiff/Respondent,

    v.           No. 15-20007-JAR

MARCAS MCGOWAN,

  Defendant/Petitioner.

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Marcas McGowan's *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 and Memorandum in Support as amended (Docs. 42, 44). The Government has responded,[1] and McGowan has replied.[2] For the reasons explained in detail below, the Court denies McGowan's motion without an evidentiary hearing.

## I. Factual and Procedural Background

On February 18, 2015, McGowan was charged in a four-count Indictment with kidnapping and firearms offenses.[3] On October 28, 2015, McGowan was charged in a five-count Superseding Indictment with kidnapping a minor resulting in the death of the minor victim, discharging a firearm during and in relation to the kidnapping, premeditated murder of the kidnapping victim by shooting the victim in the back of her head at close range, being a felon in possession of a 9mm firearm, and possession of a 9mm firearm after being convicted of crimes

---

[1] Doc. 47.

[2] Docs. 54, 55. As with his original Motion, McGowan first filed a handwritten version, followed by an "amended" typed version.

[3] Doc. 1.

of domestic violence.[4]  McGowan was represented throughout these proceedings by Thomas Bartee and Tim Burdick of the Federal Public Defender Office.

On May 26, 2016, McGowan pleaded guilty to kidnapping of a minor resulting in the death of the minor victim (Count 1) and discharging a firearm during and in relation to the kidnapping (Count 2).[5]  During the plea hearing, the Court asked McGowan if his attorneys had "gone over extensively the evidence that the government has against you in this case."[6] McGowan responded, "Yes, ma'am."[7]  The Court then asked if McGowan understood "the evidence that the government has against you in this case?"[8]  McGowan again responded, "Yes, ma'am."[9]  McGowan also confirmed that he was aware that a potential penalty of a statutory minimum of life imprisonment applied to the kidnapping charge.[10]  McGowan confirmed that he was satisfied with the advice and representation he had received from counsel, that it was his decision to enter into the plea with the government, that no one pressured, threatened, or coerced him to make that decision, and the decision to plea was made voluntarily and of his own free will.[11]

The factual basis of the plea agreement states as follows:

> During the late afternoon to early evening on July 18, 2014, Marcas McGowan and Ms. Harris had a verbal disagreement because the defendant believed Ms. Harris was cheating on him with other men. The defendant and Ms. Harris had been involved in an on-again/off-again relationship for more than five years. During this disagreement, the defendant insisted that he be allowed to review Ms. Harris's

---

[4]Doc. 18.

[5]Docs. 25, 26.

[6]Tr. Plea Hrg., Doc. 41 at 5.

[7]*Id.* at 6.

[8]*Id.*

[9]*Id.*

[10]*Id.* at 16–17.

[11]*Id.* at 7.

Facebook app on her smart phone. This verbal disagreement escalated once they arrived at the residence where they stayed together with Ms. Harris's five-year old daughter, and was owned by the defendant's grandmother. As this disagreement escalated, Ms. Harris exited the car and ran to a neighbor's house where she called 911 at approximately 6:20 p.m., and reported the defendant pulled a gun and threatened to kill her.

As Ms. Harris was at the neighbor's house reporting the defendant's threats to her, the defendant had contact with his mother and grandmother who had come outside the house in response to the commotion from the argument with Ms. Harris. The defendant decided to leave in the vehicle and the defendant's mother and/or grandmother heard the defendant ask/direct Ms. Harris's five-year old daughter to get into the vehicle. The defendant's mother and/or grandmother suggested that the defendant not take the child, but he refused to listen to that suggestion. The defendant's mother and/or grandmother then asked that he ensure the child get into the car seat but instead the defendant had the child enter the front passenger seat and not get into the car seat. As the defendant drove away from the residence with the child, a patrol car with the Atchison, Kansas Police Department arrived in response to Ms. Harris's 911 call at approximately 6:24 p.m. The defendant sped away from the house and was followed by the patrol car with lights and sirens operating.

The defendant drove through the partially residential area at speeds up to 80 m.p.h. as he fled from the officer. The defendant drove through the downtown area of Atchison and drove over the Missouri River bridge into the State of Missouri. The officers saw the defendant turn onto a road that traveled somewhat parallel to the Missouri River after crossing into the State of Missouri but lost sight of the defendant's vehicle at approximately 6:32 p.m. During this pursuit, the officers became aware that Ms. Harris's child was in the vehicle with the defendant as the victim of a kidnapping.

At approximately 6:38 p.m., another Atchison officer arrived at the residence and spoke with Ms. Harris to obtain more details about the dispute with the defendant. This officer also spoke with the defendant's mother and grandmother. During those conversations, the defendant's mother and grandmother had separate telephone conversations with the defendant while he was fleeing from the pursuing officer and it was then confirmed that the child was in the vehicle with the defendant. At various times, the defendant's mother and grandmother urged the defendant to let the child out of the car or for him to return to the house with the child. The defendant's grandmother reported to the officer that the defendant said, "The police were going to have to kill him."

The defendant's mother and grandmother agreed to let the officer speak with the defendant because they knew the defendant was familiar with this officer. Once on the telephone with the defendant at approximately 6:42 p.m., the officer attempted to persuade the defendant to return with the child or leave the child with someone else. During the officer's conversation with him, the defendant demanded that the officers bring Ms. Harris to the bridge and exchange her for the child. The defendant also told the officer that he was "tired and he could not take it anymore." Once the officer explained Ms. Harris would not be brought to the bridge, the defendant ceased speaking with the officer.

During this period, the defendant's mother or grandmother also contacted the defendant's sister, who left work and drove to the house. The defendant's sister also spoke with the defendant on the phone and when she learned that the defendant was driving somewhat parallel to the Missouri River they arranged to meet near a winery in Missouri. The defendant's sister then drove away from the residence in Atchison.

After the defendant turned onto the country road that ran somewhat parallel to the Missouri River, no law enforcement officer was following him. Approximately forty minutes later at 7:19 p.m., a deputy with the Platte County, Missouri Sheriff's Office was driving on a highway and spotted the vehicle that had been reported by Atchison as the defendant's and being involved in the kidnapping. The deputy spotted the defendant near the winery where the defendant told his sister that he would meet her. The defendant then drove toward Weston, Missouri, and away from the winery where his sister was waiting to meet him. The deputy followed the defendant but did not activate his lights or sirens.

Officers with the Weston Police Department had positioned two patrol vehicles on parking lots adjacent to the intersection of two highways in a clearly-visible fashion to the defendant as he drove through the small town at approximately 7:24 p.m. As the defendant approached the intersection, he drove around two other vehicles stopped at the red light and accelerated through the intersection, at which point the Platte County deputy and Weston officers activated their lights and sirens and began their pursuit of the defendant. A short time later while pursuing the defendant, the officers thought the defendant had taken shots at them from his vehicle. The defendant fled from the officers at speeds exceeding 95 miles per hour. During this pursuit, the deputy noticed the driver's side window of the defendant's vehicle was opened and an item was held outside, at which time the deputy heard a distinct "pop," which he believed to be another gunshot. These observations occurred while traveling a long, straight portion of the highway when the defendant noticeably reduced his speed, as though the defendant was attempting to lure the officers closer.

The pursuit continued on the highway until the defendant turned west and drove across the Missouri River on another bridge about twenty-six miles south of Atchison into Leavenworth, where additional officers were waiting and they began assisting with the pursuit at approximately 7:31 p.m.

The defendant drove through a construction barricade on the highway near the northwest corner of Leavenworth, which is another route from Leavenworth to Atchison. A short distance after crashing through the barricade, the defendant stopped the vehicle on an unfinished portion of the highway under construction at approximately 7:33 p.m. After stopping his vehicle, the defendant exited with a 9mm pistol pointed at the officers, who had arranged their vehicles behind the defendant. The officers repeatedly instructed the defendant to put down his gun but he continued to point his firearm at the officers. Because the defendant continued to point his gun at the officers and refused to drop the firearm, the officers returned fire and hit the defendant, who fell to the ground. Despite falling to the ground, the defendant continued to hold the gun and appeared to engage in actions so it would fire again. At least 16 more verbal commands were given by officers for the defendant to drop the firearm to no avail, so an officer fired again, striking the defendant, at which point he dropped the gun and stopped moving.

Once the defendant stopped moving, officers immediately approached the defendant and another went to the front passenger door of the defendant's vehicle to check on the child and saw her with lots of blood around her mouth. The officers removed the child from the car to provide first aid, but she was pronounced dead on the scene by ambulance personnel at approximately 7:42 p.m. An autopsy was performed the next day and the child's death was determined to be a homicide, with the cause being an intermediate-range gunshot entry at the back of her head. The coroner noted "there is searing of the skin and stippling adjacent to the entry." A wound was also noted under the child's chin, which was consistent with a bullet exit wound, which made it an immediately non-survivable injury with rapid death.

In searching the defendant's vehicle, agents and officers found no evidence of bullets entering the vehicle. The front passenger compartment of the defendant's vehicle was examined and the blood was centralized in the area around the passenger door and the portion of the seat closest to that door. A hole in the front passenger door arm rest was identified that could have been made by a round of ammunition. The agents removed part of the exterior of that door and found a fired bullet that had not penetrated the exterior of the door. An impact mark was noted on the inside of the door where the fired bullet had likely hit. A spent Luger 9mm cartridge was found by agents in a rear seat cup holder of the defendant's vehicle. It appears the defendant held his Bryco Arms Jennings Nine, 9mm pistol with serial number

1307281 above the child's head and shot her, after crashing through the barricade and stopping the vehicle.

The search of this murder scene included a 3D image scan, which included the defendant's vehicle and allowed software to be used in conjunction with the scan to depict the flight path of the bullet that went through the child's head and lodged in the front passenger door of the defendant's vehicle. That scan and software revealed the defendant held his gun a short distance from the child's head while the child was facing the front passenger door.

A partial DNA profile was obtained from the fired bullet recovered from inside the front passenger door of the defendant's vehicle. That profile was consistent with a known DNA profile of the child with an estimated frequency of 1 in 1 Sextillion. The ballistics analysis of this fired bullet revealed discernible class characteristics and sufficient matching individual detail to conclude it had been fired by the defendant's 9 mm handgun. Additionally, the same conclusion was reached with respect to an expended cartridge found in the rear seat cup holder of the defendant's vehicle.

The child was not the defendant's biological daughter and he had no parental rights regarding her.

As part of the investigation, agents spoke with a childhood friend of the defendant, who communicated via text message with the defendant on July 18. At approximately 6:41 p.m., the defendant sent the following text message to the friend in response to an inquiry about him being pursued by law enforcement: "Ima kill bitch." (This was approximately one minute before the Atchison officer spoke with the defendant and attempted to convince the defendant to return with the child.)

Since the defendant's arrest, he has participated in many telephone calls and visits that were recorded at the jail or holding facility and the defendant was aware that these conversations were being monitored and recorded. In these multiple conversations, the defendant has offered several stories to explain how the child was shot and how he was injured. These tales included claims that the child was shot by individuals the defendant would not identify or that the shooting of the child was due to a robbery committed by the defendant. Over time, as these individuals had more conversations with the defendant and they realized that the defendant's story did not match other information, he switched his tale to state this was the "dream" he had about how the child was shot. Some of the defendant's conversations included references to having "brain fragments in his mouth" and that it was very difficult to see someone shot in the head/face.

The defendant has prior felony convictions for criminal threat and obstruction in 2010 and domestic battery convictions in 2011, all in Atchison County, Kansas District Court, which all prohibited him from possessing a firearm or ammunition.[12]

Instead of reading the four-page factual basis set out in the plea agreement, defense counsel chose to voir dire McGowan about the facts supporting his guilty plea.[13] During that questioning, McGowan confirmed that he and his counsel had "gone over" the facts more than once and that McGowan had read every word.[14] This Court followed up with McGowan by reviewing the elements and charging language for each offense:

THE COURT: All right. In Count 1 of the indictment, Mr. McGowan, you're charged with on or about July 18th, 2014, here in Kansas and elsewhere, you willfully seized, confined, kidnapped, abducted and carried away a person, who is known as the victim. You held this victim in exchange for another person in seeking revenge against this other person. And in committing this offense, you traveled in interstate commerce from the state of Kansas to the state of Missouri back to the state of Kansas.

And at the time of this offense, this victim had not attained the age of 18 years old while you had attained 18. In other words, you were older than 18. And you were not a parent, grandparent, brother, sister, aunt, uncle, or individual having legal custody of the victim. That's the charge in Count 1 of the indictment.

Mr. McGowan, do you agree that the government has the evidence to prove what you're charged with in Count 1 of the indictment?

THE DEFENDANT: Yes.

THE COURT: And did you, in fact, do—do what you're charged with in Count 1 of the indictment?

THE DEFENDANT: Yeah.

THE COURT: All right. In Count 2 you're charged with on or about July 18th, 2014, here in Kansas and elsewhere, you knowingly brandished, discharged, carried, or used a 9mm pistol identified as a

---

[12]Doc. 26 at 2–5.

[13]Tr. Plea Hrg, Doc. 41 at 18–19.

[14]*Id.* at 19.

Bryco Arms Jennings Nine with serial number 1307281, which is a firearm, during and in relation to the kidnapping that's charged in Count 1, which is a crime of violence under the laws of the United States.

Do you believe that the government has the evidence to prove what you're charged with in Count 2 of the indictment?

THE DEFENDANT: Yes.

THE COURT: And did you, in fact, do what you're charged with in Count 2 of the indictment?

THE DEFENDANT: Yes.[15]

After AUSA Scott Rask pointed out that the Court had left out actions of McGowan with respect to the kidnapping resulting in the death of the victim, the Court added that the Superseding Indictment charged that McGowan's actions resulted in the death of that victim, and asked if he believed the government had the evidence to prove that.[16] McGowan replied, "Yeah," and the Court asked him if he caused the death of the victim.[17] McGowan replied, "Oh, no. Well . . . ," and then conferred with counsel.[18] McGowan alleges counsel told him if he did not say yes, "the Judge would not accept my plea and as [a] consequence I'd subject myself to the death penalty."[19] McGowan then answered, "Yeah," and the Court again asked, "Your actions led to the death of the victim, did they not?"[20] McGowan answered, "Yeah," and confirmed that the government could prove those charges.[21]

---

[15]*Id.* at 19–21.

[16]*Id.* at 21–22.

[17]*Id.* at 22.

[18]*Id.*

[19]McGowan Aff., Doc. 44-1 at 7.

[20]Tr. Plea Hrg., Doc. 41 at 22.

[21]*Id.*

A presentence investigation report ("PSIR") was ordered and the revised PSIR was filed on November 7, 2016.[22]  The base offense level for the kidnapping charge was 32, and added enhancements for six levels because McGowan demanded of law enforcement officers that they bring the minor victim's mother to a bridge in exchange for the minor victim;[23] four levels because the minor victim was killed;[24] two levels because the victim was vulnerable;[25] six levels because McGowan assaulted law enforcement officers;[26] and to two levels for recklessly creating a substantial risk of death or serious bodily injury to another person.[27] After a three-level reduction for acceptance of responsibility, the total offense level was 49.[28]

Because the kidnapping of the minor child resulted in the death of the minor victim, a cross-reference to U.S.S.G. § 2A1.1 applied, so the base offense level became 43.[29]  The enhancements included two levels for vulnerable victim;[30] six levels for assaulting law enforcement officers;[31] and two levels for recklessly creating a substantial risk of death or serious bodily injury to others.[32]  After a three-level reduction for acceptance of responsibility, the total offense level was 50.[33]

---

[22]Doc. 35.

[23]*Id.* ¶ 43.

[24]*Id.* ¶ 44.

[25]*Id.* ¶ 46.

[26]*Id.* ¶ 47.

[27]*Id.* ¶ 48.

[28]*Id.* ¶¶ 52, 53.

[29]*Id.* ¶ 54.

[30]*Id.* ¶ 55.

[31]*Id.* ¶ 56.

[32]*Id.* ¶ 57.

[33]*Id.* ¶¶ 61–63.

The Guidelines range for the discharging a firearm count was ten years, consecutive to the kidnapping sentence.[34]

McGowan's criminal history resulted in seven points, which placed him in category IV,[35] for a Guidelines sentence of life on Count 1 and 120 months consecutive on Count 2.[36]  There were no objections to the PSIR.[37]

On November 22, 2016, this Court sentenced McGowan to life imprisonment on the kidnapping charge and 120 months on the firearm charge, to be served consecutively.[38] McGowan did not pursue a direct appeal.

## II.     Standard

Section 2255 entitles a federal prisoner to relief if the court finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or [is] otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[39] The court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[40]  A § 2255 petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence.[41]  An evidentiary hearing is not necessary where the factual allegations are

---

[34]*Id.* ¶ 65.

[35]*Id.* ¶ 78.

[36]*Id.* ¶ 118.

[37]*Id.* ¶ 136.

[38]Docs. 36–38.

[39]28 U.S.C. § 2255(b).

[40]*United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995) (quoting 28 U.S.C. § 2255(b)).

[41]*In re Lindsey*, 582 F.3d 1173, 1175 (10th Cir. 2009).

contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[42]

The Sixth Amendment guarantees that "[i]n all criminal prosecution, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[43]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[44]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[45]  To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[46]  This standard is "highly demanding."[47]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[48]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[49]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error, and "every effort should be made to 'eliminate the distorting effects of hindsight.'"[50]

---

[42]*See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996) ("[t]he allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1143, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims that are merely conclusory in nature and without supporting factual averments).

[43]U.S. Const. amend. VI; *see Kansas v. Ventris*, 556 U.S. 586 (2009).

[44]466 U.S. 668 (1984).

[45]*Id.* at 688.

[46]*Id.* at 690.

[47]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[48]*Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[49]*Strickland*, 466 U.S. at 687.

[50]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

To meet the second prong, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[51] To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[52] A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[53] This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[54]

A defendant is entitled to the effective assistance of counsel during plea negotiations.[55] "The performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness."[56] "To show prejudice in the guilty plea context, the defendant must establish that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and insisted on going to trial.'"[57]

In all events, a defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[58] "The performance component need not be addressed first. 'If it is easier to dispose of an

---

[51]*Strickland*, 466 U.S. at 687.

[52]*Id.* at 694.

[53]*Id.*

[54]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

[55]*Lafler v. Cooper,* 566 U.S. 156, 162–63 (2012).

[56]*Id.* at 163 (internal quotation marks omitted).

[57]*Heard v. Addison*, 728 F.3d 1170, 1176 (10th Cir. 2013) (quoting *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985)).

[58]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'"[59]

## III.    Discussion

### A.    Timeliness

A defendant's § 2255 motion is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which establishes a one-year limitations period for federal prisoners seeking habeas relief.[60] This statute provides that a defendant has one year from the date his judgment of conviction becomes final to file his § 2255 motion.[61] "In the context of the one-year limitation period for filing a § 2255 motion, a criminal conviction becomes final when the Supreme Court affirms it on direct review, denies certiorari, or (in the absence of a certiorari petition) the time for filing a certiorari petition expires."[62] Because no direct appeal was taken, the motion must have been filed within one year of McGowan's deadline to appeal this Court's judgment.

The Federal Rules of Appellate Procedure make clear that McGowan had fourteen days from the Court's judgment in which to file an appeal; applying this to the statute of limitations governing § 2255, McGowan had one year and fourteen days to file the instant motion.[63] In short, McGowan's § 2255 motion could only be considered timely if filed on or before December 6, 2017. As a *pro se* prisoner, McGowan may take advantage of the so-called "prison

---

[59]*Id.* (quoting *Strickland*, 466 U.S. at 697); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[60]*See* 28 U.S.C. § 2255(f).

[61]28 U.S.C. § 2255(f)(1).

[62]*United States v. Prows*, 448 F.3d 1223, 1227 (10th Cir. 2006).

[63]Fed. R. App. P. 4(b).

mailbox" rule, under which the motion is deemed filed when delivered into the prison mail system, regardless of when it is received by the district court clerk.[64]

McGowan's § 2255 motion was filed by the clerk of court on December 11, 2017.[65] The postmark on the envelope for McGowan's § 2255 motion is December 7, 2017.[66] The end of the Motion and in McGowan's unsworn affidavit included with his Motion, however, both reflect that McGowan signed the documents on December 6, 2017.[67] In the service section of his Motion, McGowan purports to have placed the Motion in the prison mailing system on December 6, 2017;[68] his Application to Proceed Without Prepayment of Fees Affidavit is also dated December 6, 2017.[69] The government does not challenge the timeliness of McGowan's original Motion, and the Court finds it was timely submitted.[70]

### B.    Knowing and Voluntary Plea

"A defendant's guilty plea must be knowing, voluntary, and intelligent. To enter a plea that is knowing and voluntary, the defendant must have a full understanding of what the plea connotes and of its consequence."[71] "Rule 11 of the Federal Rules of Criminal Procedure prescribes procedures designed to ensure a plea is made knowingly and voluntarily."[72] Thus to

---

[64]*See Houston v. Lack*, 487 U.S. 266, 276 (1988); *United States v. Gray*, 182 F.3d 762, 765–66 (10th Cir. 1999).

[65]Doc. 42.

[66]Doc. 42-1.

[67]Doc. 42 at 27, 41.

[68]*Id.* at 27.

[69]*Id.* at 29.

[70]*See Price v. Philpot*, 420 F.3d at 1165 (10th Cir. 2006) (citing *Houston*, 487 U.S. at 276) (holding a *pro se* prisoner's § 2255 motion may in some cases be considered filed as of the date the motion was given to prison officials for mailing). As discussed in Section III. C., *infra*, the government does challenge McGowan's attempt to add claims in his Amended Motion filed December 20, 2017. Doc. 44.

[71]*United States v. Hurlich*, 293 F.3d 1223, 1230 (10th Cir. 2002) (citations and internal quotation marks omitted).

[72]*United States v. Elias*, 937 F.2d 1514, 1517 (10th Cir. 1991).

determine whether a plea agreement is knowing and voluntary, the Tenth Circuit considers "whether the language of the plea agreement states that the defendant entered the agreement knowingly and voluntarily," and whether the trial court conducted "an adequate Federal Rule of Criminal Procedure 11 colloquy."[73]

Absent a believable reason justifying departure from their apparent truth, the accuracy and truth of a defendant's statements at a Rule 11 proceeding at which his plea is accepted are conclusively established.[74] The record of the plea hearing contains nothing to suggest McGowan's plea was either unknowing or involuntary, or that he was unaware of the consequences of his plea. The plea colloquy indicates that McGowan acknowledged that he had gone over the charges with counsel, that he understood what he was charged with, that he discussed the evidence that the government had against him with counsel, and that he and counsel had discussed the plea agreement together.[75] McGowan indicated that he was satisfied with the advice and representation he had received from counsel, that it was his decision to enter into the plea with the government, that no one pressured, threatened, or coerced him to make that decision, and that the decision to plea was made voluntarily and of his own free will.[76] The Court questioned McGowan about the elements of both charges and he confirmed that he kidnapped the victim resulting in the death of the victim and that the government could prove the charges against him.[77] The Court questioned McGowan's understanding of the sentencing range

---

[73]*United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004); *United States v. Rollings*, 751 F.3d 1183, 1187–90 (10th Cir. 2014).

[74]*United States v. Glass,* 66 F. App'x 808, 810 (10th Cir. 2003); *United States v. Jones*, 124 F.3d 218 (10th Cir. 1997).

[75]Tr. Plea Hrg., Doc. 41 at 5–6.

[76]*Id.* at 7.

[77]*Id.* at 19–22.

of a mandatory minimum of life imprisonment on the kidnapping charge and ten years on the firearms charged, to be served consecutively, and he indicated he understood.[78]

Despite this record, McGowan contends that counsel failed to investigate the facts of his case and to properly advise him that an accidental death does not qualify for the increased punishment authorized for the kidnapping of a minor resulting in the death of the minor victim as charged under 18 U.S.C. § 1201(a)(1). McGowan claims that his plea was therefore not knowing and voluntary and requests the Court permit him to withdraw his guilty plea to the kidnapping resulting in death of the minor victim charge, plead guilty to a less-severe charge of kidnapping, and be sentenced to something less than life imprisonment for that offense.

In support of his claim, McGowan offers a version of events he purports to have told his counsel in an effort to explain how the minor victim was killed by a gunshot wound to the back of her head.[79] McGowan alleges that after he fled law enforcement and crossed from Kansas to Missouri with the victim in his car, he parked in a secluded area and called two individuals from whom he stole methamphetamines and cash the night before. These individuals then showed up where McGowan was parked and engaged McGowan in a gunfight, shooting both him and the victim. McGowan then sped off to the hospital, with law enforcement in hot pursuit. When he ran out of gas, he claims he exited the vehicle with the victim in his arms, at which time the officers shot him. McGowan claims that counsel did not investigate the facts and evidence of his case and before sentencing, he told counsel that he wanted to withdraw his plea but counsel told him "it was a done deal."[80]

---

[78]*Id.* at 17–19.

[79]McGowan Aff., Doc. 44-1.

[80]*Id.*

As the government points out, this version of events, along with several others, were referenced in the factual basis of the plea agreement.[81]  The Court agrees that McGowan's current version of events is wholly inconsistent with both the facts of the plea agreement and the physical and forensic evidence in this case.  But even assuming McGowan's version is true, his claim that counsel erroneously advised him regarding the factual predicate for his plea under § 1201(a)(1) is misguided.  The Tenth Circuit has explained that a kidnapping charge under § 1201(a)(1) becomes a capital offense "if the death of any person results" from the kidnapping, and does not require an intent-to-kill element.[82]  The Tenth Circuit has also held, in another case construing a similar statute that, "even if the phrase 'if death results' were to be construed as an element of the offense rather than a sentencing enhancement, it would not be an intent element but only an element of factual consequences."[83]  The fact that someone else may have shot the victim is simply not relevant, as McGowan's claimed version of events still supports a conclusion that the kidnapping resulted in the minor victim's death.  Accordingly, McGowan cannot establish that counsel's performance was deficient.

Even if counsel's performance was unreasonable, however, McGowan cannot satisfy the prejudice prong of the *Strickland* test to prevail on his claim.  To prevail on the prejudice prong in the guilty plea context, a defendant must show that there is "a 'reasonable probability' that he 'would not have pleaded guilty and would have insisted on going to trial' but for counsel's

---

[81]Doc. 26 at 5.

[82]*See United States v. Woodlee*, 136 F.3d 1399, 1405 (10th Cir. 1998) (holding that similar provision in 18 U.S.C. § 245 that increased sentence "if bodily injury results" requires the government to only show that the defendant's "illegal conduct resulted in bodily injury; not that the defendant intended bodily injury" and that "the standard 'is one of causation, not state of mind.'").

[83]*United States v. Nichols*, 38 F. App'x 534, 538 (10th Cir. 2002) (construing 18 U.S.C. § 2332a, conspiring to use a weapon of mass destruction providing for punishment by death or any term of years or life "if death results").

errors."[84]  The court is required to make a holistic inquiry into all the factual circumstances surrounding the plea to determine whether the petitioner would have proceeded to trial.[85]  Mere allegations that the petitioner would have insisted on going to trial, although necessary, is insufficient.[86]  "Proof of prejudice requires a petitioner to show that 'a decision to reject the plea bargain would have been rational under the circumstances.'"[87]  To determine rationality, the court should assess "objective facts specific to a petitioner, such as age, the length of the sentence he faced under the terms of the plea deal, the prospect of minimizing exposure to other charged counts, and so on."[88]  The Tenth Circuit "remain[s] suspicious of bald, post hoc and unsupported statements that a defendant would have changed his plea absent counsel's errors."[89]  While a defendant need not show that he would have prevailed at trial, his prospects of succeeding inform the court's view whether he in fact would have gone to trial absent the alleged errors.[90]  The strength of the government's case is the best evidence whether defendant would in fact have changed his plea and insisted on going to trial.[91]

In light of the extensive agreed factual basis in the plea agreement, McGowan has not shown a reasonable probability that but for counsel's alleged conduct, the results of the plea proceeding would have been different, that is, he would not have agreed to plead guilty to the

---

[84]*Heard v. Addison*, 728 F.3d 1170, 1175–76 (10th Cir. 2013) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

[85]*Id.* at 1183.

[86]*Id.* at 1184.

[87]*Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

[88]*Id.* at 1183.

[89]*Id.* at 1184.

[90]*United States v. Triplett*, 263 F. App'x 688, 690 (10th Cir. 2008); *see United States v. Clingman*, 288 F.3d 1183, 1186 (10th Cir. 2002).

[91]*See Hill v. Lockhart*, 474 U.S. 52, 59–60 (1985).

kidnapping resulting in death of the minor victim charge.[92]  McGowan does not argue that a jury

likely would not have convicted him on this charge, and the record does not reflect any viable

defense to the charges in Count 1.  As part of the plea, McGowan acknowledged a four-page

single-spaced factual basis for the plea that set out in detail how he kidnapped the minor victim

and how that kidnapping resulted in the victim's death.[93]  This evidence was supported by the

physical and forensic evidence in the case, including blood evidence, law enforcement dashboard

camera videos, McGowan's possession of a 9mm handgun that ballistic evidence matched to the

bullet shot through the victim's head and the expended cartridge found in McGowan's vehicle,

and images from a crime scene 3D software program that illustrated the range of possibilities

that existed for placement of the 9mm handgun at the time of discharge and the flight path of the

bullet that went through the victim's head.  Moreover, by entering the plea agreement, McGowan

avoided the death penalty sentence related to the kidnapping count as well as the dismissed

premeditated murder charge.[94]  In light of the evidence and benefits received under the plea

agreement, McGowan has not shown how a decision to reject the plea agreement would have

been rational under the circumstances.[95]  Accordingly, the Court denies McGowan's claim that

counsel was ineffective on these grounds.

### C.      *Johnson* and *Apprendi* Claims

In his Amended Motion, which purportedly is the typed and edited version of his

handwritten motion submitted December 6, 2017, McGowan reserves the right to amend his

---

[92]*See United States v. Young*, 206 F. App'x 779, 785 (10th Cir. 2006).

[93]Doc. 26 at 2–5.

[94]Count 3 charged McGowan with premeditated murder of the kidnapping victim by shooting the victim in the back of her head at close range during the perpetration of kidnapping as set forth in Count 1, in violation of 18 U.S.C. § 924(j)(1), which is punishable by death or by any term of years or for life.

[95]*See Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

§ 2255 petition "in light of" *Johnson v. United States*[96] and *Apprendi v. New Jersey*.[97]  A claim raised in an amended pleading relates back to the original pleading only when the claim "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."[98]  As the government notes, nothing about the Supreme Court's holdings in either of these cases relate to allegations of ineffective assistance of counsel and McGowan offers no basis for relating back, rendering the claims untimely.

Even if timely, however, McGowan does not elaborate on either claim or state any facts in support.[99]  Although courts have a duty to construe *pro se* motions liberally, "it is not the proper function of the district court to assume the role of advocate for the *pro se* litigant."[100]  Construing McGowan's claims broadly, he reserves the right to amend his petition to collaterally attack his conviction and sentence.  In his plea agreement, however, McGowan specifically waived his right to collaterally attack any matter in connection with the prosecution, conviction, and sentence, except for claims challenging the validity of the plea or waiver.[101]  These claims are denied.

## IV.  Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2255 Proceedings, the court must issue or

---

[96]135 S. Ct. 2551 (2015).

[97]530 U.S. 466 (2000).

[98]Fed. R. Civ. P. 15(c)(1)(B).

[99]Doc. 44 at 15–19.

[100]*United States v. Thody*, 460 F. App'x 776, 779 (10th Cir. 2012) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003).

[101]*See United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001); *United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004); Doc. 26 at 10–11.

deny a certificate of appealability when it enters a final order adverse to the applicant.[102]  A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.[103]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[104]  For the reasons stated above, the Court finds that McGowan has not satisfied this standard and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Marcus McGowan's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, as amended (Docs. 42, 44) is **denied** without evidentiary hearing; McGowan's Motion to Amend his reply (Doc. 55) is **granted**; McGowan is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: <u>August 28, 2018</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[102]The denial of a § 2255 motion is not appealable unless a circuit justice or a district judge issues a certificate of appealability.  Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[103]28 U.S.C. § 2253(c)(2).

[104]*Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).